GEORGE W. CAMPBELL, appellant,

*v.*

A. ALOYSIA SMULLEN, respondent.

[Decided June 27th, 1924.]

On appeal from a decree of the court of chancery advised by Advisory Master Rosenberg, who filed the following opinion:

"The bill of complaint is filed to establish a will of Mary Frances Campbell, alleged to have been made and executed on the 1st day of March, 1915, and thereafter lost. The complainant is the husband of the testatrix. He claims to be the sole legatee and devisee under that will and executor thereof. The defendants are the brother and two sisters of the decedent and the husband of one of the sisters.

"The bill alleges further that the two sisters of the decedent, namely, Kathryn V. Burns and A. Aloysia Smullen, and William H. Smullen, husband of A. Aloysia Smullen,

by deed dated the 3d day of March, 1921, and recorded on the 8th day of March, 1921, conveyed to the complainant their interest in the lands and premises which were owned by the said testatrix at the time of her death. This allegation has in reality no relevancy to the questions raised by the bill itself.

"The defendants have filed answers, the substance whereof is that they do not admit or deny the allegations of the bill of complaint, but state they have no information sufficient to form a belief and put the complainant upon strict proof.

"The defendants A. Aloysia Smullen and Kathryn V. Burns have filed a counter-claim in which they allege that the deeds which they made to the said complainant were obtained by fraud, and pray that they may be set aside.

"(1) On or about the 1st of March, 1915, the complainant and his wife executed their wills, in which each devised to the other all his or her property, real or personal, and appointed the other as executor of the will. It is sufficiently established to my satisfaction that these wills were drawn by Charles A. Burr, a lawyer in New York, and were duly executed in the presence of two witnesses, and that the same were executed and attested in entire accordance with the laws of this state.

"During the summer of 1919 Mrs. Campbell consulted Frederick C. Simons, a lawyer at Great Neck, Long Island, and handed him a carbon copy of the will which her husband had made, saying to him that she had lost her will, and he thereupon prepared two wills, one for her and one for her husband. These wills were intended to be identical in their provisions and phraseology with the will which had been executed in March, 1915. The carbon copy of the will of 1915, drawn by Mrs. Campbell, was produced in evidence before me, as well as the draft of the will which was prepared by Mr. Simons in 1919. This will that was drawn in 1919 was delivered by Mr. Simons to Mrs. Campbell. Mr. Simons testifies that, 'subsequently, I had another talk with Mrs. Campbell, and she said that they were going to

come down and fix up these wills.' I says, 'Haven't you found the old one yet? and she said, 'No, they haven't found it.'.

"They never came, and these new wills were never executed. The will of March, 1915, has never been found.

"As I have already indicated, I am entirely satisfied that the will in the form set forth in the bill of complaint was duly executed on the 1st of March, 1915. The question then be fore me is, Can this will of March, 1915, be established as a lost will?

"Before determining that question, it may be necessary to say a few words on the preliminary questions raised by the defendants as to the admissibility of the evidence adduced before me. The first claim is that the declarations of the alleged testatrix are not admissible. The cases which are cited in support of this point are all cases where the declarations of the testator was offered as to the contents of a will which was actually produced and proved. None of these cases go to the question of the evidence of the testator as to the loss or disposition of a will or the contents of a lost paper. That the declarations of the testator both before and after the making of the will are admissible in a case such as this, was decided in the famous case of *Sugden* v. *St. Leonards, L. R. 1 Prob. Div. 154,* which has been cited and followed in this state.

"*Secondly.* The objection is also made to the testimony of the attorney who drew the wills on the ground that the statements to him of Mrs. Campbell and her instructions to him were privileged communications and not admissible. Merely to state this objection is to refute it, to say nothing of the fact that no objection was made on this ground at the hearing.

"It is, however, unnecessary to deal at any length with these objections in view of the conclusions I have come to as to the case itself.

"On the whole case, and on the entire evidence that has been produced, I am of the opinion that the will of March 1st, 1915, cannot be established and proved as a lost will,

and I may say that I have come to this conclusion after great hesitation and much to my regret.

"It is a well-established principle that when a will is left in the hands of the testator, and is not found at the time of his death, a presumption of a revocation arises. And it is equally well settled that this presumption may be overcome by proof.

"All the cases, however, are in accord, that where the will is lost or destroyed while in the possession of the testator, the loss or destruction must be without his knowledge, or the presumption of revocation is not overcome. *Sugden* v. *St. Leonards, supra; McBeth* v. *McBeth, 11 Ala. (N. S.) 596; Dawson* v. *Smith, 3 Hous. (Del.) 335; In re Deaves, 21 Atl. Rep. 395.*

"Whatever would have been the situation before the time the testatrix went to Mr. Simons to have a new will drawn. it is unnecessary to consider.

"At that time, six or seven months before her death, she knew that her will was lost, or was where it could not readily be found. She realized that under those circumstances she would, if she died, be considered, or, at least, be in danger of being considered, to have died intestate. That must have been the reason why she had a new will drawn. Yet she never executed the new will—with all the opportunity for doing so, she must be presumed to have had a good reason for not executing it. Everyone is charged with the knowledge of the legal consequences of his acts and his omissions. It is clear that the decedent realized the possible situation at the time of her death, and with the opportunity to provide against it. did nothing.

"There is evidence that the decedent was ill during that time, but she was not so ill that she could not have gone through the simple formality of having her will attested. In fact, there would be the more inducement if her health had been, in her judgment, precarious, to have this done. That she may have continued to have the intention to leave all her property to her husband does not affect the result, so long as she did not put that intention into the form which the law has devised for her.

"There is evidence on the part of the defendants that the decedent was not living happily with her husband. It is true that at the time of her death she was living apart from him, whether because of any disagreement, or for other reasons, the testimony is in some conflict.

"It is established, to my mind, that the husband advanced to the decedent money for the real estate whereof she died seized.

"These various considerations are, in view of the legal situation, it seems to me, of no importance.

"The following language of Chief-Justice Paxson, in *Deaves' Appeal, supra,* is peculiarly applicable to the case in point:

" 'This was an attempt to probate a will alleged to have been lost during the lifetime of the testator. There is no doubt that when it is shown that the will of a testator was in existence, unrevoked, at the time of his death, and was afterwards lost or destroyed, its contents may be proved by parol, and the will, as thus reproduced, may be admitted to probate. So much was decided in *Foster's Appeal, 87 Pa. St. 67.* The weak spot in the appellant's case is that there was no proof that the testator left behind him an unrevoked will, or any will whatever. On the contrary, it is an admitted fact that the will, which it was alleged the testator had executed, was lost or destroyed in his lifetime, and that its loss was known to him months before his death. There was proof of his declarations that he intended to make another will, possibly containing the same provisions, but he never did so. Knowing that he had no will, he declined or neglected to make one. From this a presumption of revocation may fairly be inferred. It would not be safe to place too much reliance upon the declarations of a testator under such circumstances. From anything we know he may have destroyed his will because he was not satisfied with its provisions, and yet have decided to conceal the knowledge of that fact to avoid importunity.' See, also, *McBeth* v. *Mc-Beth, supra.*

"I am forced to the conclusion that the alleged lost will cannot be established and that the bill must be dismissed.

"(2) *The counter-claim.* The object of the counter-claim is to set aside two deeds—the first made by the defendants Kathryn V. Burns and A. Aloysia Smullen, dated May 15th, 1920, purporting to have been acknowledged on that day, in Bergen county, before G. L. Siebenmann, commissioner of deeds, but not recorded; the second, from the defendants Kathryn V. Burns and A. Aloysia Smullen and William H. Smullen, her husband, dated March 3d, 1921, purporting to have been acknowledged March 5th, 1921, in Bergen county, by Mrs. Smullen and Mrs. Burns before G. L. Siebenmann, commissioner of deeds, and on March 3d, 1921, in New York City, by William H. Smullen, before Frank H. Hennessy, a master in chancery of this state. This deed was recorded March 8th, 1921, in the Bergen county clerk's office.

"The first deed it is claimed was not acknowledged; that the commissioner was not present to take the acknowledgment, and did not take it, and that the deed was executed in New York City.

"As to Mrs. Burns, who is and was then a widow, the presence or absence of an acknowledgment can be of no importance. The deed, while it may not be entitled to go in evidence without formal proof or be recorded, is good *inter partes*.

"As to Mrs. Smullen, the question of acknowledgment of this deed is equally immaterial. As she executed it without her husband joining in it, it is void. No decree is necessary to establish this invalidity, even had this court any right to make a decree for this purpose.

"As to the second deed, it is claimed that it was executed and acknowledged on Sunday by Mrs. Burns and Mrs. Smullen, and is void for that reason.

"The testimony is very unsatisfactory, both because of the manner of Mrs. Smullen on the witness-stand, as well as of Siebenmann, the commissioner. The commissioner's condition on the stand was pitable, due probably, it must be said in justice to him, to some physical ailment.

"Mrs. Burns did not testify. Mrs. Smullen testifies that she signed a paper on a Sunday, May 16th, but she is not clear that this is the paper she signed. She says that she did not know what she was signing; that she never saw the paper; that Campbell said he had a paper; that there was something wrong with the previous one, and then Mr. Siebenmann came in. That she signed it without seeing it, because she took Campbell's word for everything.

"The difficulty with that testimony is that the deed, which was apparently made to cure the defect [Mr. Smullen's not joining], bears date March 3d, 1921, while the first deed bears date May 15th, 1920.

"Siebenmann testifies that he took an acknowledgment on March 5th, 1921—a Sunday—and dated it a week-day. But the acknowledgment is dated *March 5th, 1921,* and this was a Saturday. His whole testimony, however, is so unsatisfactory that, on this branch of the case, I would put no reliance on it.

"It is significant that on the one side neither Mrs. Burns nor Mr. Smullen was called, and on the other side Mr. Campbell did not testify on this point.

"I have stated these points simply because some stress was laid upon them by the defendant's counsel.

"That a deed delivered on a Sunday, is absolutely void, is clear. Whether an acknowledgment taken on Sunday, where an acknowledgment is necessary to give title [*P. L. 1918 p. 119*], is void, has apparently not been passed upon.

"However that may be, the question of the legal validity of these deeds is not for this court, or, at least, cannot come under its jurisdiction as the case stands.

"The evidence in this case as to the alleged fraud is extremely unsatisfactory on both sides. Neither Mrs. Burns nor Mr. Smullen was called as witnesses.

"Mrs. Smullen's testimony is as follows:

"'*Q.* What did Mr. Campbell say to you?

"'*A.* Well, my sister came to live with me, and he gave me to understand that there was a will and that May died, and that everything belonged to him,' * * * 'and asked my sister and I if we

would go down to his lawyer, that made out a deed for this house, and we should go down there; of course, it belonged to him, but rather than to have any extra lawyer's expenses and fees, and all that sort of thing, if we would just sign it over to him that it would be all right. And he said he would fix the place up and he would give us our share of it  He gave us a bag of jewelry that my sister had left.' ' * * 'He said that, under the law of Jersey, that every-thing belonged to him. It belonged. There was no question about it.'

"On that Mrs. Smullen and Mrs. Burns signed a deed at Mr. Simons' office in New York. As to the second deed she says:

" '*Q*. Did you know what you were signing?
" '*A*. I did not.
" '*Q*. Had you ever read over this paper?
" '*A*. No, I never saw it.
" '*Q*. Had Mr. Campbell said anything to you with regard to what the paper was?
" '*A*. He told me he had a paper, another paper. It did not make any difference whether I signed it or not, but just simply there was something wrong with the other one, but he had this paper, and then Mr. Siebenmann [the comissioner] walked in.'

"In a later part of the testimony she says [as to the first deed]:

" 'Oh, the conversation was, will my sister and I go down to Simons' office and sign deeds, and it would take probably some months for this house to be put in condition and to get a fair price for it. In the meantime, I was to go over there and live and take care of the house, and live there, and then, when it was sold, he would share with us.'

"The complainant's testimony is this:

" '*Q*. What discussion did you have with the brother and the sisters of Mrs. Campbell with reference to this property after her death?
" '*A*. The sisters acknowledged——
" '[Objected to.]
" 'Well, I asked them to come to Mr. Simons' office, and he drew up papers for them to sign off.' * * * 'I asked them to come to Mr. Simons' office to sign papers which would release the property and turn it over to me. They came down to his office, signed the papers, and each received the legal fee of one dollar apiece.'

"Further on he testifies:

" 'They [Mrs. Smullen and Mrs. Burns] said: "The property belongs to you; you have worked for it and earned it, and we have no right to it."
" 'Q. Therefore, they were willing to sign without consideration?
" 'A. Without consideration.'

"I have recited substantially all the testimony that is material to this subject.

"It will be observed that between the time the first deed was executed by Mrs. Smullen, the one in which her husband did not join, and the second deed, more than a year had intervened. During that time she and her sister had every opportunity of making an investigation and ascertaining the facts. I cannot conceive that when Mrs. Smullen was informed that a corrective paper was to be executed by her, if she was dissatisfied with the previous one, that she was then willing to execute such a new paper without even inquiring as to its contents.

"It is to be observed, as I have said, that neither Mr. Smullen nor Mrs. Burns has been called as a witness as to their understanding of the transaction.

"'There is some testimony as to the bag of jewelry that had belonged to Mrs. Campbell that was given to Mrs. Smullen and Mrs. Burns by the complainant. From Mrs. Smullen it might be conceived that this was a consideration for the deed, or, at least, part consideration. While that seems to be negatived by the complainant's own testimony, however, it seems to me that the whole transaction, including the delivery of the jewelry and the delivery of the deeds, was and could well be construed as a settlement. The sisters obtained the jewelry and were perfectly willing to have the complainant have the title to the house, it being in their minds, and understood by them, that the money for the house had been contributed by the complainant. That it had been so contributed by the complainant is clearly demonstrated by the evidence in the case.

"I do not see any reason for believing that either Mrs. Smullen or Mrs. Burns was deceived by the statements of the complainant in the particular that the law of the State of New Jersey gave him the title. At least, they had abundant opportunity to investigate as to the truth or falsity of this statement. If it were a statement of law, they were chargeable with the same knowledge of the law as the complainant. If, having been made outside of the territory of the State of New Jersey, and, therefore, a statement of fact, it may be said that they had abundant opportunity to ascertain what the fact was.

"It is a well-established rule that for mere inadequacy of consideration, unconnected with fraud, a court of equity will not set aside a contract. *Phillips* v. *Pullen, 45 N. J. Eq. 830.* There are exceptions to this rule in certain cases. As, for example, expectant heirs and reversioners. But this is not one of these exceptions. Here the parties were adversely interested, were entirely competent, and were dealing at arm's length. Mrs. Smullen is a woman of considerable intelligence, and her attitude on the stand convinces me that by disposition she is not readily to be subjected to another's will.

"On the whole case, it appears to me that the defendants have not borne the burden of showing fraud, and I shall therefore advise that the counter-claim be dismissed. The defendant Edward F. Cavanaugh is entitled to costs on his answer. No other costs nor counsel fees will be allowed.

"Decree may be settled on two days' notice."

*Mr. Frank H. Hennessy,* for the appellant.

*Messrs. Kellogg & Chance,* for the respondent.

PER CURIAM.

The decree appealed from will be affirmed, for the reasons stated in the opinion filed in the court below by Advisory Master Rosenberg.

*For affirmance*—THE CHIEF-JUSTICE, TRENCHARD, KAL-ISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, VAN BUSKIRK, KAYS—10.

*For reversal*—None.